**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

*FILED IN OPEN COURT*
*JUL 11 2017*
*CHARLES R. DIARD, JR.*
*CLERK*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **CRIMINAL NO. 17-CR-00139** |
| | ) | |
| KAREN HILL | ) | |

## PLEA AGREEMENT

The defendant, **KAREN HILL**, represented by her counsel, and the United States of America have reached a plea agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

## RIGHTS OF THE DEFENDANT

1.     The defendant understands her rights as follows:

    a.     To be represented by an attorney;

    b.     To plead not guilty;

    c.     To have a trial by an impartial jury;

    d.     To confront and cross-examine witnesses and to call witnesses and produce other evidence in her defense; and

    e.     To not be compelled to incriminate herself.

## WAIVER OF RIGHTS AND PLEA OF GUILTY

2.     The defendant waives rights b through e, listed above, and pleads guilty to Count One of an Information, charging a violation of Title 18, United States Code, Section 371 (Conspiracy to Violate the Anti-Kickback Statute).

3.      The defendant understands that the statements she makes under oath in the plea of guilty must be completely truthful and that she can be prosecuted for making false statements or perjury, or receive a perjury enhancement at sentencing, for any false statements she makes intentionally in this plea of guilty.

4.      The defendant expects the Court to rely upon her statements here and her response to any questions that he may be asked during the guilty plea hearing.

5.      The defendant is not under the influence of alcohol, drugs, or narcotics.  She is certain that she is in full possession of her senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing which will follow.

6.      The defendant has had the benefit of legal counsel in negotiating this Plea Agreement.  She has discussed the facts of the case with her attorney, and her attorney has explained to the defendant the essential legal elements of the criminal charge which has been brought against her.  The defendant's attorney has also explained to the defendant her understanding of the United States' evidence and the law as it relates to the facts of her offense.

7.      The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charge beyond a reasonable doubt.  The defendant and her counsel have discussed possible defenses to the charge.  The defendant believes that her attorney has represented her faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of her attorney.

8.      A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing.  The Factual Resume is incorporated by reference into this Plea Agreement.  The defendant and the United States agree that

2

the Factual Resume is true and correct.   Alterations to the Plea Agreement or Factual Resume initialed only by the defendant and her counsel are not part of this agreement and are not agreed to by the United States.

9.      This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement.   There have been no promises from anyone as to the particular sentence that the Court will impose.   The defendant is pleading guilty because she is guilty.

10.      The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter.   This waiver includes, but is not limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

## **PENALTY**

11.      The maximum penalty the Court could impose as to Count One is:

a.      Five years imprisonment;

b.      A fine not to exceed $250,000;

c.      A term of supervised release of 3 years, which would follow any term of imprisonment.   If the defendant violates the conditions of supervised release, she could be imprisoned for the entire term of supervised release;

d.      A mandatory special assessment of $100.00; and

e.      Such restitution as may be ordered by the Court.

4851-0256-0843.1

**SENTENCING**

12.    The Court will impose the sentence in this case.  The United States Sentencing Guidelines are advisory and do not bind the Court.  The defendant has reviewed the application of the Guidelines with her attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation.  The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance with the Guidelines.   The defendant understands that she will not be allowed to withdraw her guilty plea if the advisory guideline range is higher than expected, or if the Court departs or varies from the advisory guideline range.

13.    The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

14.    The United States will provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation.   Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

15.    Both the defendant and the United States are free to allocute fully at the time of sentencing.

4851-0256-0843.1

16.     The defendant agrees to tender $100.00 to the U.S. District Court Clerk in satisfaction of the mandatory special assessment in this case.  The United States reserves the right to withdraw any favorable recommendations it may agree to within this document if the defendant fails to pay the special assessment prior to or at the time of her sentencing.

## FINANCIAL OBLIGATIONS

17.     The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.  In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

## UNITED STATES' OBLIGATIONS

18.     The United States will not bring any additional charges against the defendant related to the facts underlying the Information.  This agreement is limited to the United States Attorney's Office for the Southern District of Alabama.   However, the United States Attorney's Offices for the Middle District of Florida and the Southern District of Florida also agree to be bound by this plea agreement and will not further prosecute the defendant based on the facts underlying the Information. This agreement does not bind any other federal, state, or local prosecuting authority.

4851-0256-0843.1

19.    For purposes of calculating the advisory guideline range, the United States will argue that the loss amount is more than $550,000.00 but less than $1,500,000.00. This loss amount accounts for the illegal kickbacks paid to Dr. Xiulu Ruan and Dr. John Patrick Couch in the Southern District of Alabama, as well as to certain doctors in the Middle District of Florida and the Southern District of Florida.

20.    The United States will recommend to the Court that the defendant be sentenced at the low end of the advisory sentencing guideline range as determined by the Court.

## APPLICATION OF USSG § 5K1.1 AND/OR FED. R. CRIM. P. 35

21.    The defendant understands and agrees that she has no right to cooperate, and that the decision whether to allow her to cooperate is reserved solely to the United States in the exercise of its discretion.  If the United States agrees to allow the defendant to cooperate, and if the defendant agrees to cooperate, the following terms and conditions apply:

   a. The defendant shall fully, completely, and truthfully respond to all questions put to her by law enforcement authorities regarding the underlying facts of the offense(s) with which she is charged, as well as the underlying facts of any criminal offense(s), state or federal, of which she has information or knowledge.

   b. The defendant acknowledges that she understands that she shall provide truthful and complete information regarding any offense about which she has knowledge or information regardless of whether law enforcement authorities question her specifically about any such offense.  This provision requires the defendant to divulge all information available to her even when

6

law enforcement authorities do not know about the defendant's involvement, knowledge or information relating to any particular offense. This requirement extends to any and all persons about whom the defendant has such knowledge or information.

c. The defendant agrees to cooperate completely with all law enforcement authorities in any matters to which her cooperation may be deemed relevant by any law enforcement authority. The defendant agrees to fully comply with all instructions from law enforcement authorities regarding the specific assistance she shall provide. This includes, but is not limited to, consenting to monitored and/or recorded telephone conversations, participating in undercover operations, testifying completely and truthfully before any grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

d. If the United States deems it necessary, the defendant may be required to take a polygraph examination(s) which will be administered by a government polygrapher. The defendant agrees that the results of any polygraph examination may be used by the United States in its evaluation of whether there has been substantial assistance, and are admissible at sentencing to rebut an assertion by the defendant of bad faith or unconstitutional motive on the part of the United States.

e. The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in her possession or under her control and which are relevant to her participation in and

7

knowledge of criminal activities, regardless of whether it relates to the charged offense. This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

f. The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the illegal activities of another.

g. If the defendant provides full, complete, truthful and substantial cooperation to the United States, which results in substantial assistance to the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise of its sole discretion, then the United States agrees to move for a downward departure in accordance with Section 5K1.1 of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, whichever the United States deems applicable. The United States specifically reserves the right to make the decision relating to the extent of any such departure request made under this agreement based upon its evaluation of the nature and extent of the defendant's cooperation. The defendant understands that the United States will make no representation or promise with regard to the exact amount of reduction, if any, the United States might make in the event that it determines that the defendant has provided substantial assistance. The defendant understands that a mere interview with law enforcement authorities does not constitute substantial

4851-0256-0843.1

assistance. The defendant also understands that, should he provide untruthful information to the United States at any time, or fail to disclose material facts to the United States at any time, or commits a new criminal offense, the United States will not make a motion for downward departure. If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend that the defendant receive a sentence at the low end of the advisory guideline range.

h. The United States and the defendant agree that any breach of this agreement by the defendant, including but not limited to committing a new offense, failing to cooperate, intentionally withholding information, giving false information, committing perjury, failing to identify assets obtained by her from her illegal activities or obtained by others associated with her or of which she has knowledge, refusing to take a polygraph examination, failing a polygraph examination, or refusing to testify before the grand jury or at any judicial proceeding, would:

(1) permit the United States to reinstate and proceed with prosecution on any other charges arising from the matters underlying the Information; and

(2) permit the United States to initiate and proceed with the prosecution on any other charges arising from a breach of this agreement. The United States will not be limited, in any respect, in the use it may make against the defendant of any

4851-0256-0843.1

information provided by the defendant during her breached cooperation.  Such breach will constitute a waiver of any claim the defendant could make under the United States Constitution, the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, or any statute or case law by which the defendant seeks to suppress the use of such information or any evidence derived from such information.

i. Nothing in this agreement shall protect the defendant in any way from prosecution for any offense committed after the date of this agreement, including perjury, false declaration, false statement, and obstruction of justice, should the defendant commit any of these offenses during her cooperation.  The defendant acknowledges and agrees that the information that she discloses to the United States pursuant to this agreement may be used against her in any such prosecution.

j. The United States and the defendant agree that the defendant will continue her cooperation even after she is sentenced in the instant matter.  Her failure to continue her cooperation will constitute a breach of this agreement, and the defendant agrees that under such conditions, the United States will be free to reinstate any charges that could have potentially been brought against her.  Under these circumstances, the defendant expressly waives any rights she may have under the statute of limitations and the speedy trial provisions.

4851-0256-0843.1

## LIMITED WAIVER OF RIGHT TO APPEAL AND
## WAIVER OF COLLATERAL ATTACK

22. As part of the bargained-for exchange represented in this plea agreement, and subject to the limited exceptions below, the defendant knowingly and voluntarily waives the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255.  Accordingly, the defendant will not challenge her guilty plea, conviction, or sentence in any district court or appellate court proceedings.

    a.    **EXCEPTIONS.**  The defendant reserves the right to timely file a direct appeal challenging:

    (1)    any sentence imposed in excess of the statutory maximum;

    (2)    any sentence which constitutes an upward departure or variance from the advisory guideline range.

The defendant also reserves the right to claim ineffective assistance of counsel in a direct appeal or § 2255 motion.

23. If the United States files a notice of appeal and such appeal is authorized by the Solicitor General, the defendant is released from the appellate waiver.

24. The defendant further reserves the right to timely move the district court for an amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the sentence.

25. If the defendant receives a sentence within or below the advisory guideline range, this plea agreement shall serve as the defendant's express directive to defense

4851-0256-0843.1

counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by the defendant.

## VIOLATION OF AGREEMENT

26.    The defendant understands that if she breaches any provision of this Plea Agreement, the United States will be free from any obligations imposed by this agreement, but all provisions of the agreement remain enforceable against the defendant.   In the exercise of its discretion, the United States will be free to prosecute the defendant on any charges of which it has knowledge.  In such event, the defendant agrees not to assert any objections to prosecution that she might have under the Sixth Amendment and/or Speedy Trial Act.

27.    In addition, if the defendant is released from detention prior to sentencing, she understands that the United States will no longer be bound by this agreement if she violates any condition of her release prior to sentencing or prior to serving her sentence after it is imposed.

## ENTIRETY OF AGREEMENT

28.    This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

Respectfully submitted,
STEVEN BUTLER
ACTING UNITED STATES ATTORNEY

Date:  June 17, 2017

Christopher Bodnar
Assistant United States Attorney

12

Date:  June 17, 2017

Deborah Griffin
Assistant United States Attorney

Date:  7/1/17

Vicki M. Davis
Assistant United States Attorney
Chief, Criminal Division

I have consulted with my counsel and fully understand all my rights with respect to the offense charged in the Information pending against me.  I have read this Plea Agreement and carefully reviewed every part of it with my attorney.  I understand this agreement, and I voluntarily agree to it.  I hereby stipulate that the Factual Resume, incorporated herein, is true and accurate in every respect, and that had the matter proceeded to trial, the United States could have proved the same beyond a reasonable doubt.

Date:  7/11/17

Karen Hill
Defendant

I am the attorney for the defendant.  I have fully explained her rights to her with respect to the offense charged in the Information in this matter.  I have carefully reviewed every part of this Plea Agreement with her.  To my knowledge, her decision to enter into this agreement is an informed and voluntary one.  I have carefully reviewed the Factual Resume, incorporated herein,

13

4851-0256-0843.1

with the defendant and to my knowledge, her decision to stipulate to the facts is an informed, intelligent and voluntary one.

Date: 7/11/17

Lisa Noller
Attorney for Defendant


Date: 7/11/17

Dan Martin
Attorney for Defendant

14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO.** |
| | ) | |
| **KAREN HILL** | ) | |

## FACTUAL RESUME

The defendant, **KAREN HILL**, admits the allegations of Count One of the Information.

## ELEMENTS OF THE OFFENSE

**KAREN HILL** understands that in order to prove a violation of Title 18, United States Code, Section 371, as charged in Count One of the Information, the United States must prove beyond a reasonable doubt:

*First*:      Two or more persons in some way agreed to try to accomplish a shared and unlawful plan to violate the Anti-Kickback Statute, the elements of which are:

        (1) at least one co-conspirator knowingly and willfully offered, paid, solicited, or received any remuneration, directly or indirectly, overtly or covertly, in cash or in kind;

        (2) the remuneration was offered, paid solicited, or received, at least in part, to induce or in exchange for the prescribing of Subsys, a drug covered by a federal healthcare program; and

        (3) the Subsys prescription was paid for, in whole or in part, by a federal healthcare program.

*Second*:      The defendant knew the unlawful purpose of the plan and willfully joined in it;

*Third*:      During the course of the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the Information; and

*Fourth*:      The overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

1

## OFFENSE CONDUCT

Defendant, **KAREN HILL**, admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case. This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for **HILL's** plea of guilty. The statement of facts does not contain each and every fact known to **HILL** and the United States concerning **HILL's** involvement in the charge set forth in the plea agreement.

Pharmaceutical fentanyl is one of the most powerful opioid analgesics approved for human use. It is approximately 40 to 60 times more powerful than morphine. Consequently, fentanyl is designated as a Schedule II Controlled Substance. The manufacturing, distribution, and prescribing of fentanyl, particularly in its instant release form, is highly regulated.

Prior to its acquisition by a competitor in October 2011, Cephalon, Inc., was a pharmaceutical company headquartered in Pennsylvania. Among other drugs, Cephalon manufactured and marketed a fentanyl-based drug sold under the brand name Actiq. Due to the significant dangers posed by fentanyl, including the possibility of death, Actiq was only approved by the FDA for the management of breakthrough cancer pain in opioid-tolerant adult patients. Later, Cephalon developed an instant release fentanyl drug marketed under the name Fentora.

According to a lawsuit filed by the Department of Justice, between 2001 and 2006, Cephalon allegedly promoted Actiq off-label for use in non-opioid tolerant and non-cancer patients. Cephalon sales representatives were trained to focus on physicians other than oncologists, and to sell the drug under the mantra "pain is pain." Due to these practices, the company was criminally charged with distribution of misbranded drugs. In September 2008, Cephalon entered a guilty plea to the criminal charge and agreed to pay $425 million to resolve allegations of its illegal marketing practices.

2

Insys Therapeutics, Inc. is a pharmaceutical company headquartered in Arizona.  On or about January 5, 2012, the Federal Drug Administration ("FDA") approved Insys to manufacture and market an instant release sublingual fentanyl spray sold under the brand name Subsys.  Like Actiq, the only FDA approved indication for Subsys is for "the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."  Due to the serious risks involved with instant release fentanyl, doctors, pharmacists, and patients are all required to register with the FDA's Transmucosal Instant Release Fentanyl Risk Evaluation and Management Strategy ("TIRF-REMS") Program before Subsys can be prescribed, filled, or used.  In addition, due to its high price point, many insurance companies require doctors to seek prior approval before agreeing to pay for Subsys prescribed to a patient.  A 30-day supply of Subsys typically costs between $1,000.00 and $30,000.00 depending on the strength and dosage requirements.

Subsys was officially launched into the market in or about late March 2012.  By the end of June 2012, senior leadership within Insys had grown dissatisfied with the sale of Subsys.  Thereafter, then-President and CEO Individual #1 began making personnel changes.  On or about June 7, 2012, Insys hired former Cephalon sales representative **KAREN HILL** as a specialty sales professional ("SSP") for the Orlando, Florida territory.  Starting at a base salary, with the ability to make more in performance bonuses, **HILL** was tasked with promoting Subsys to doctors in and around central Florida.  At approximately the same time, Insys hired Individual #2, another ex-Cephalon sales representative, to be the new Southeast Regional Sales Manager for Insys.  The following month, Insys hired a third former Cephalon sales representative, Individual #3.  Individual #3 was originally hired to be the Subsys sales representative for a single doctor, Dr. Xiulu Ruan in Mobile, Alabama.

3

In late June 2012, Individual #1 sent an e-mail to the Insys sales managers, including Individual #2, entitled "*Live Speaker Targets*."   The e-mail was intended to ensure that the sales managers understood "*the important nature of having one of their top targets as a speaker.  It can pay big dividends for them.*"

In or about August 2012, Insys launched its Insys Speaker Program whereby doctors were paid an honorarium, typically ranging between $1,000.00–$3,000.00, in exchange for conducting brief speaking programs in their local area.   On the surface, the programs were designed so that doctors currently prescribing Subsys would have a forum to extol its benefits to other potential Subsys prescribers.   However, in reality, the benefit of the speaker programs to Insys was that it was means by which the company could put extra money in the pockets of high-prescribing doctors in exchange for their continued, and hopefully increasing, prescribing of Subsys.   As Individual #2 explained in a text to a SSP around the time the Insys Speaker Programs began, "[*t*]*hey do not need to be good speakers, they need to write a lot of Subsys*."

Individual #2 also used his early time at Insys to express his sales ideas of marketing Subsys off-label to pain management doctors with upper management.   In an August 4, 2012 e-mail to Individual #1 and another Insys executive, Individual #2 stated, in part, :

> *Customers often ignorantly describe Subsys as a "loaded gun."  Interestingly enough — A loaded gun is often times exactly what is necessary to shoot down excruciating pain.   This is a weapon in their arsenal that cannot be replaced. Subsys is a necessity in the "tool box" of every pain management physician.   We cannot allow the BLACK BOX warning for respiratory depression to stand in the way of Subsys therapy.*

In or about September of 2012, Individual #2 was promoted to Vice President of Sales for Insys, and Individual #3 became **HILL's** manager.  Under his direction, and utilizing sales tactics learned at Cephalon, **HILL** quickly excelled as an SSP in the Orlando Territory.  By at least October 2012, **HILL** was successfully implementing speaker programs in Florida and SSPs from other territories were reaching out to her for advice on how to sell doctors on prescribing Subsys

4

to their patients; **HILL** provided directions, including those she was directed to provide by her supervisors.

One such call occurred on or about October 10, 2012 between **HILL** and a Subsys SSP covering a different territory (identified herein as SSP-1). During this call, SSP-1 asked **HILL** for advice on how to get doctors in his territory to prescribe Subsys.

**HILL:** *Let me tell you something, the entire key to this business is finding out — and it's one of the hardest things — it's not selling a doctor on Subsys, it's not, you know, anything except finding out what that doctor wants. . . . Some of my guys want money, and that motivates them to speak. Some of my guys want me to hang out with them after hours, and I do. Um, some of my guys want dark chocolate as weird as that sounds. . . . Anything. You just got to find out what his hot button is.*

Later during the phone call, the following conversation ensued between SSP-1 and **HILL** regarding what to do with a doctor who was an Insys-paid speaker, but who had not increased his prescribing of Subsys after being paid.

**SSP-1:** *Now the thing is we've made him a speaker, and he has spoken for us, but he has not increased his level of script writing and he's not writing a ton. So —*

**HILL:** *You've got to find somebody else. So what you do with a guy like that is keep him warm. You don't put all your resources into him. You can maybe have one last conversation with him, it's a little uncomfortable for you, it's not like pushing him —*

**SSP-1:** *I've had the conversation with him.*

**HILL:** *Ok, you're done with him then. You're done.*

**SSP-1:** *Ok, so he's no longer a speaker then. . . .*

<center>*                    *                    *</center>

**SSP-1:** *You know, realistically, this is my guy. You know, I had told ____ [Individual #3], I said ____, "This guy doesn't see enough patients that are going to be eligible." And he goes "Listen, ____ [Individual #2] has ridden with you and he thinks that this is your guy." I said alright, you know, then alright —*

<center>5</center>

**HILL:**    *Yeah, right.  Keep him in your back pocket.  Continue to do the things we talked about.  You don't have to take him off the speaker — this is the guy that was the speaker, or this is another guy?*

**SSP-1:**    *He, uh, is actually the only speaker in my territory currently.*

**HILL:**    *So, so leave him there, leave him alone, don't delete him.  But what you really need to be doing is find some guys that wanna play ball.  This guy he's not wanting to play ball. . . .*

<p style="text-align:center">*            *            ***

**HILL:**    *Try to think of it this way.  Here is how I think about my business.  We're getting paid 10% of everything that we bring in.  Then the next question I ask myself is where can I go and just get any business.  Screw the decile stuff.  Screw what they have the ability to do.  Um, you know, there are two ways to go about it as far as I'm concerned.  The company talks high deciles, frequency, blah, blah, blah.  I don't think that.  I say you go where guys are interested in playing ball. . . .*

**HILL** told SSP-1 the easiest way to get money in SSP-1's pocket right away was to target doctors currently prescribing Actiq and to "*scare the shit out of them*" with talk about potential liability related to Actiq.  Thereafter, SSP-1 asked **HILL** for advice on how to identify other potential Subsys speakers.

**SSP-1:**    *Now, Karen.  So let's go back to the speakers.  So I have this speaker.  I'm going to keep him on hold.  Now when identifying a new speaker, I mean, how do you identify a new speaker?  Do you ask the speaker "Hey, what's important to you, what are you driven fin—, I guess, I'm guessing, speaker programs are driven financially, right?*

**HILL:**    *Yeah, don't, don't ask them anything like that.  What you want to do is find a guy that is accessible and friendly and wants to sort of talk to you.  Talk to him about Subsys.  If he is open and willing say "Great" and, you know, do your normal selling message and say, "That's awesome, and you know what, right now in my territory I'm really looking to develop a speaker, and you're a thought leader in the community.  I've heard other doctors mention your name, and if this is something you find works well for you in your practice, I would be honored to have you as a speaker.  I mean you can let me know how it goes.  We'll get you some clinical experience, obviously, and you can let me know how it goes.  If this is something you're interested in, I tell you what, I would be absolutely honored to have you as a speaker."  And that's how that goes.  Then they'll either be like "Really?" or they'll kind of be like, you'll see a hesitation, and then just back off and you know that's not your guy.*

<p style="text-align:center">6</p>

On or about October 26, 2012, SSP-1 and **HILL** had another conversation covering many of the same topics discussed on October 10, 2017.  SSP-1 told **HILL** that SSP-1 was getting married soon, and asked her for advice on how to drive SSP-1's Subsys prescription numbers up so that SSP-1 could keep SSP-1's job and pay for the wedding.  Thereafter, the following conversation ensued:

SSP-1:    *I think you said it best earlier.  I think you said something to the effect of, "You know, you've got to find speakers that are willing to speak and get paid to write the prescriptions.  How are you identifying these speakers, Karen?  How can I drive —*

**HILL:**    *I'll tell you how.  Any doctor that's money hungry, or that are just going through divorce, or doctors opening up a new clinic, doctors who are procedure heavy. All those guys are money hungry.  Doctors that speak for other companies, if they're known as like company whores, you know they speak for everybody, those guys.*

SSP-1:    *Ok, now alright, so let's go with speaker whores. Ok —*

**HILL:**    *Speaker whores.*

Later in the conversation, **HILL** gives SSP-1 tips on how to identity doctors who have the potential to be good speakers for Subsys.

**HILL:**    *So if you see guys that, you know, who are in need of attention, frankly.  Or, guys going through divorces.  I mean they're hurting for money big time. So if you can provide solutions —*

　　　　　　　　　*　 *　 *

**HILL:**    *Yeah, and uh, the way to find out [if a doctor is financially motivated] is, to throw out a semi carrot and just say something to the effect of "You know, I'm trying to sort of launch this territory, and I'm looking for someone who is interested in possibly speaking, you know, does that appeal to you at all?" And if they're like, "Oh yeah, I'm all about it," if you can tell that they jump at that, then, once you got them reeled in like that, you say, "Look, that's awesome.  I could really use a speaker in my territory and if you're very excited about it, I'm very excited also.  You know, so what I need for you to do is gain a little bit of clinical experience, we don't have to wait very long, but, you know, obviously, if you're going to speak on it you're going to want to have some of that so you're comfortable and so you've got some credibility in the community.  And, um, let me go over this information with*

7

> *you, and get some patients started, and I can have you speaking literally next month if that's something you're interested in." Let them know that you're looking to move quickly if they're looking to move quickly kind of a thing. . . . So that's what you do. And if there is a light in their eyes that goes off, you know that's your guy. And if they're kind of like "Yeah, well, you know, I've thought about it," not your guy.*

SSP-1:     *Ok, so when you're going out and doing this, are you casting a really wide net and offering it to anybody and waiting to see what their reaction is.*

**HILL:**     *Yes, I am.*

Thereafter, **HILL** and SSP-1 discussed how to go about persuading doctors to prescribe Subsys. **HILL** noted that if a doctor had never prescribed Subsys before, to start slowly by asking the doctor to think of just one patient they might see during the week for which Subsys would be a good fit.

SSP-1:     *So when you find those doctors that are, you know, that get that light in their eyes, that are financially driven, you ask them for that one or two patients, they get that and then —*

**HILL:**     *No. No. No, listen. The guys you're going to ask for one or two patients, that's your regular doctors that you're going to see, no light in his eyes. You know, that's how you get one or two patients out of the normal guys. The guys that are hungry, you say, "Great. How many patients do you see a day, and they say 30, and you say great, you know, listen how many patients do you think would be a good fit for Subsys this week?" Then you just shut up. And maybe they'll say 1, maybe they'll say 2, maybe they'll say 7 or 8. Whatever they say, you say "That's how many vouchers I am going to leave with you. I want to make sure you get 30 free units of Subsys." So, because with those guys, you know, you could ask for more. You could ask "Do you think you'll see at least one a day?" "Well yeah, I'll see one a day". "Great then I'll leave five vouchers for you this week, and lets go and get those patients started and we'll get you speaking next month my friend."*

Finally, **HILL** reminds SSP-1 not limit himself where SSP-1 looked to find doctors to prescribe Subsys.

**HILL:**     *Just remember, any doctor, if you have any friends that are doctors, anybody can write this drug. It does not have to be a high decile doctor. Anybody. A script is equal to one script. It does not matter if an oncologist writes it, if a [physician's assistant] writes it, if a [primary care physician]*

4851-0256-0843.1

*writes it. It, it does not matter. You just want the scripts coming out, and the company does not give a shit where they come from.*

**HILL's** success as an SSP directly resulted in her substantial financial compensation. In addition to her base salary, **HILL** made bonus payments during just the first three quarters of 2013. These bonuses were primarily based on the value of prescriptions written by doctors in **HILL's** Orlando Territory.

Due to her success at encouraging doctors to prescribe Subsys in the Orlando Territory, **HILL** replaced Individual #3 upon his promotion and became the District Sales Manager for the Miami Region in late August 2013. In this position, **HILL** inherited and supervised the SSPs operating in Florida, as well as Natalie Perhacs, the SSP assigned, by that time, to Dr. Xiulu Ruan and Dr. John Patrick Couch in Mobile, Alabama. **HILL** held this position from on or about August 29, 2013 through on or about June 22, 2015. Thereafter, **HILL** again replaced Individual #3 upon his promotion, and **HILL** became the Regional Director for the Southeast, which still encompassed the Miami Region. As Regional Director, her base salary was increased.

During the time **HILL** was a District Manager, the Miami Region continued to be the most successful region for Subsys prescriptions. **HILL** managed SSPs who persuaded doctors to prescribe Subsys through, among other means, payments made for participating in Insys Speaker Programs. **HILL** was compensated for then-existing business generated under Individual #3, as well as new prescriptions written within the Miami Region. **HILL** was the highest compensated district manager for Insys each quarter of 2014. In addition to her base salary, **HILL** was paid bonus payments during two years she was District Manager of the Miami Region. As was the case when she was an SSP, **HILL's** bonus payments directly related to the sales of Subsys in the region she managed.

4851-0256-0843.1

During the nearly two-year period that **HILL** presided over the most successful regional territory for Insys, certain doctors within the Miami Region were highly paid by Insys for conducting Insys Speaker Programs. These same doctors were also some of the highest prescribers of Subsys in the entire United States.

Despite Subsys being approved only for opioid tolerant adult cancer patients, none of the highest paid Insys speakers in the Miami region were oncologists. Rather, nearly all practiced pain management.

As **HILL** explained to SSP-1, the key to finding a good Insys speaker was finding a doctor willing to "*play ball.*" Among the nine highest paid doctors in the Miami Region, **HILL** recommended to Insys that three of these doctors be placed on the Insys speaker program. The other six physicians were on the Insys speaker program before **HILL** took over the Region, and they remained thereafter. **HILL** knew the doctors were prescribing Subsys to patients insured by both private and federal insurance carriers. Many of these top Insys-paid doctors were also amongst the top prescribers in the nation.

Paying speaker program fees to the top prescribing doctors was not limited to **HILL** in the Miami Region. Rather, under the direction of Individual #1, Individual #2, Individual #3, and others, Insys Speaker Programs were used as a means to pay kickbacks to high Subsys prescribing doctors across the nation.

Natalie Perhacs was one of the SSPs who directly reported to **HILL** after she became District Manager for the Miami Region. Despite having no experience in pharmaceutical sales, Perhacs was hired by Individual #3 to be the SSP in Mobile, Alabama. In late 2013 and early 2014, Dr. Ruan and Dr. Couch began writing a tremendous number of prescriptions for Abstral, an instant-release fentanyl competitor to Subsys. They did so after purchasing over a million dollars of stock in Abstral's manufacturer, Galena Biopharma, with the intention of manipulating

10

Galena stock prices through their prescribing of Abstral.   From the last quarter of 2013 through 2014, Dr. Ruan and Dr. Couch were the #1 and #2 prescribers of Abstral in the nation, and accounted for approximately one-third of *all* Abstral prescriptions in the United States during this time period.

The fact that Dr. Ruan and Dr. Couch began prescribing Abstral after having been major prescribers — and long-time Insys-paid speakers — was a major source of tension within Insys. **HILL**, as Perhacs' supervisor, was directly involved in this crisis.

On December 3, 2013, **HILL** sent an e-mail to SSPs, including Perhacs, entitled "*Action required tonight.*"   In it she stated:

> *I need to hear from you guys tonight on what you're doing with these doctors to counteract the efforts of Lazanda and Abstral and what your plan is with all this. I will personally report your feedback directly to _____(name omitted ) and Individual #1. This is for ALL on this list, not just the highlighted ones.*

On December 6, 2013, **HILL** and Perhacs exchanged a series of e-mails related to Dr. Ruan's prescribing of the competitor drug Abstral:

**HILL:** *FYI we gotta get a handle on this.  No good.  [Referencing an attachment]*

Perhacs: *The Abstral numbers are a huge challenge for me.  I am doing everything I can.  Is that what you're looking at?  I just glanced quickly.*

**HILL:** *Yes, just want you to be aware of where your territory stands when the company looks at it.*

Perhacs: *I appreciate that.  I am doing everything I can.  I do not know at this point what other angle to take.  I am always open to suggestion.  I cannot stop Dr. Ruan from writing [Abstral] and I know they expect me to be able to.  I am giving this and the charts 100% of my attention.  Please reach out if you have any other suggestions.*

**HILL:** *You're doing a fantastic job!  Truly.*

Perhacs: *It's only going to get better for both of us.*

Despite Perhacs's efforts to stem the flow of Abstral prescriptions being written by Dr. Ruan and Dr. Couch, the two doctors continued to switch their patients from Subsys to Abstral.

11

This led to Insys sending **HILL** to Mobile to personally work with Perhacs on the issue.   As stated in an early January e-mail exchange between **HILL** and Individual #2:

**HILL:**    *FYI.  I'm planning a three day week with Natalie in a couple of weeks. (Already have a flight and hotel, etc.)*

Individual #2:    *We're not going to get those pts back from Couch and Ruan.  They switched 70 pts from Subsys just last week.   They love Natalie, but they don't respect her.  This is a major problem.  I'm very upset about it and don't know what to do.*

At some point in late 2013 or early 2014, but no later than January 28, 2014, **HILL** was made aware that Dr. Ruan was prescribing Abstral over Subsys because he and Dr. Couch were heavily invested in Galena Biopharma.  Despite efforts made by Individual #2 and **HILL** through Perhacs, this was the primary reason Dr. Ruan and Dr. Couch continued to prescribe Abstral.  On February 10, 2014, **HILL** lamented, "*Looking at their data, between Ruan and Couch have written 435 Abstral rxs.  Hopefully with a little help from above we can land this.*"   Perhacs responded, "*I saw it too.  It's a hard pill to swallow.*"

The following month, Dr. Ruan's prescribing of Abstral was still a major concern within Insys.  On March 6, 2014, Individual #2 e-mailed **HILL** and Individual #3 stating, "*What is Dr. Ruan doing.  55 Abstral in 1 week.  Wow!!!!*"  On March 12, 2014, Individual #2 forwarded an e-mail entitled "*Abstral Relies on 5 Dr. for 53% Business*" to **HILL** and Individual #3 and stated, "*Dr. Ruan and Dr. Couch are killing us.*"

By April 2014, Dr. Ruan and Dr. Couch were still prescribing Abstral while also still being Insys-paid speakers.   On April 7, 2014, **HILL** sent an e-mail to SSPs, including Perhacs, in which **HILL** reminded her SSPs, "*Remember [Insys Speaker Programs] equate to sales.  There's a direct correlation between the territories ranked at the top vs. the numbers of [Insys Speaker Programs] conducted with them.  Statistics don't lie.  Do them.*"  The following day, **HILL** e-mailed Perhacs and explained, "*Unfortunately I've been informed that Dr. Couch and Dr. Ruan have had their*

12

[*Insys Speaker Program*] *allotments reduced to 5 each for now.*" This reduction in Insys speaker programs for Dr. Ruan and Dr. Couch was directly related to their diminishing Subsys prescriptions and their failure to stop prescribing Abstral.

On May 20, 2015, Dr. Ruan and Dr. Couch were arrested on a federal charges related to practices at their pain clinic. On February 23, 2017, a jury in the Southern District of Alabama convicted Dr. Ruan and Dr. Couch of, among other felonies, receiving illegal kickbacks in the form of speaker program fees from Insys in exchange for prescribing Subsys.

On February 17, 2016, Natalie Perhacs pled guilty to knowingly conspiring to pay illegal kickbacks to Dr. Ruan and Dr. Couch in exchange for their prescribing Subsys.

On December 06, 2016, Individual #1, Individual #2, Individual #3, and several other Insys executives were indicted in the District of Massachusetts on federal criminal charges, including the illegal payment of kickbacks in the form of speaker fees in exchange for the doctors prescribing Subsys.

**HILL** conspired with Individual #1, Individual #2, Individual #3, Perhacs and others, both known and unknown, to orchestrate the systematic payment of kickbacks to doctors in the Miami Region, — which included doctors in the Southern District of Alabama, the Middle District of Florida and the Southern District of Florida — in exchange for those doctors prescribing Subsys. This illegal kickback scheme had a direct financial benefit for **HILL**.

AGREED TO AND SIGNED.

Respectfully submitted,

STEVEN BUTLER
ACTING UNITED STATES ATTORNEY

Date: ___June 17, 2017___        _____

Christopher J. Bodnar

13

4851-0256-0843.1

Assistant United States Attorney

Date:   June 17, 2017

Deborah A. Griffin
Assistant United States Attorney

Date:   7/11/17

Vicki M. Davis
Assistant United States Attorney
Chief, Criminal Division

Date:   7/11/17

Karen Hill
Defendant

Date:   7/11/17

Lisa Noller
Attorney for Defendant

Date:   7/11/17

Dan Martin
Attorney for Defendant

14